The Deposition of

# CAPTAIN FRANK GUTTUSO

In the Matter of

# SHANTELL ARNOLD

versus

# JOSEPH P. LOPINTO, III, ET AL

Taken On

# DECEMBER 13, 2023



Exhibit 10

**121**
1 to you?
2   A.   It's possible. More than likely, he
3 would have handed it to me. But again, I don't
4 recall that interaction of actually getting my
5 physical hands on -- whether I got an e-mail and I
6 went and printed it or he actually gave it to me.
7   Q.   When you showed Deputy Alvarado the
8 video, did you show it to him more than once,
9 where you showed it once where he can look at it
10 and see the seven seconds, or did he ask to see it
11 multiple times?
12   A.   No. I think I just showed him -- to my
13 recollection, I think I just showed it to him
14 once.
15   Q.   Did you share it with him, give him a
16 copy of it?
17   A.   No.
18   Q.   Like AirDrop it or e-mail it, text it or
19 something like that?
20   A.   No.
21   Q.   So after you have the conversation with
22 Deputy Alvarado, what did you do next in your
23 investigation?
24   A.   I contacted Chief Wingrove and explained
25 to him the conversation I had, you know, that that

**122**
1 was Deputy Alvarado.
2   Q.   Confirmed that it was Deputy Alvarado in
3 it?
4   A.   Yeah. And this is what -- you know, I
5 spoke to him and I told him this is what he said.
6   Q.   You told -- wait. When you said "he" --
7   A.   I told Chief Wingrove this is what
8 Deputy Alvarado told me, which is the same thing I
9 just told you.
10          And I said I'm having him write a white
11 paper and I told him to hold off on a report right
12 now because, to me, if we write a report right
13 now, it looks like we're trying to cover our butt,
14 for lack of better terms. I don't know exactly
15 how I said it.
16   Q.   What did Chief Wingrove --
17   MR. MARTINY:  Let him finish.
18 BY MR. CARTER:
19   Q.   I'm sorry. I thought you were finished.
20 Continue.
21   A.   So I advised Chief Wingrove that, and he
22 said, yeah, just have him write the white paper
23 right now and contact Internal Affairs and we're
24 going to send it to them.
25   Q.   After you talked to -- well, let me back

**123**
1 up.
2          When you talked to Chief Wingrove, did
3 you make it clear to Chief Wingrove that Deputy
4 Alvarado did not write a report for the incident?
5   A.   Yes.
6   Q.   Did you also make clear to Chief
7 Wingrove that Deputy Alvarado asked whether or not
8 he should write a report?
9   A.   I don't know if I told him that
10 specific.
11   Q.   Or like he wanted to -- or he you
12 indicated -- I mean you tell me.
13   A.   Well, I told him that he wanted to
14 write -- I mean, I had told him that initially he
15 wanted to write a report before our conversation.
16 Now, I don't know if I told him the conversation
17 necessarily he had when I told him -- during our
18 conversation between me and Deputy Alvarado, I
19 don't know if I told Chief Wingrove that he said
20 do you still want me to write the report? And I
21 may have said that. I don't recall saying it, but
22 possible I probably would have said something like
23 that.
24   Q.   And just -- I'm trying to be clear.
25   A.   Right.

**124**
1   Q.   Did you tell Chief Wingrove that you
2 told him to hold off on writing a report?
3   A.   Yes, I did tell Chief Wingrove that.
4   Q.   Did Chief Wingrove then tell you -- what
5 did he say in response to that?
6   A.   I told him why, which is basically the
7 same thing I told you, is, you know, that I didn't
8 think it looked right that we -- that's not the
9 way we normally do things. We don't go back and
10 write a report after you mark it up "NAT."
11 Generally. That's not the procedure that we use.
12 Because, to me, it looks, you know, like we trying
13 to cover your butt now.
14          So I explained that to Chief Wingrove,
15 and he agreed with me and said, yes, go ahead and
16 have him do the interoffice memorandum, have him
17 get that to you and then contact Internal Affairs.
18 And then our conversation ended there.
19          And I contacted probably William
20 Boudreaux, who was the -- I'm not sure what his
21 rank was at the time but might have been a major.
22 He was the commander of Internal Affairs, internal
23 management.
24   Q.   And how did you contact him?
25   A.   I probably would have contacted him by

**137**

1  A. No. No.
2  Q. Did he deny making any changes because
3 of the video going viral?
4  A. Ask that question again. Did he deny?
5  Q. According to this report -- let me --
6  A. Right.
7  Q. -- refer you to this language, this
8 sentence that I'm referring to: "Deputy Alvarado
9 advised he did this" -- and referring to the
10 previous sentence where he changed it from NAT to
11 medical roll and that he didn't write a report but
12 he will write a report.
13  A. Right.
14  Q. Deputy Alvarado, according to this
15 sentence, advised he did this because he felt --
16 quote, "he felt it had to be done and it had
17 nothing to do with the video that surfaced," end
18 quote.
19  A. That's what he told me.
20  Q. That's what he told you as well?
21  A. Yeah. That's what I told you earlier he
22 told me.
23  Q. Did you find that statement from Deputy
24 Alvarado that he did this, he made those changes
25 from NAT to medical roll and he didn't write a

**138**

1 report but now he was going to write a report, did
2 you find his statement credible that that had
3 nothing to do with the video that had surfaced?
4  A. Yes. Because what he told --
5  Q. Simple question.
6  A. Basically what I said earlier is when I
7 showed him the video, he said he had not seen it,
8 so I had no indication that he had saw it. So
9 that's not why -- he told me he was changing the
10 video because after he thought about it later that
11 night, he felt he should have written a report,
12 which I took as, you know, he knows he was
13 supposed to write a report on it and he didn't, so
14 now he was going to write a report on it.
15  Q. So you thought -- you took him at his
16 word --
17  A. Yes.
18  Q. -- and you thought he was credible when
19 he said that the changes that he made had nothing
20 to do with the video?
21  A. Right. Had no evidence otherwise.
22  Q. He just thought it was the right thing
23 to do?
24  A. Correct. Or best.
25  Q. But according to this --

**139**

1  A. Based on the information he had.
2  MR. MARTINY: Wait. The witness did not say
3  he thought he was credible. The witness
4  said --
5  MR. CARTER: Stop. I'm clarifying.
6  MR. MARTINY: You're summarizing his
7  testimony, and he didn't say that.
8  MR. CARTER: I'm asking him yes or no. I
9  mean, he's answering a --
10 BY MR. CARTER:
11  Q. Officer, am I -- Captain, am I confusing
12 any of your questions?
13  MR. MARTINY: He answered your question, and
14  he said: I had no reason to disbelieve him.
15 BY MR. CARTER:
16  Q. And my question is: Did you find this
17 statement that it had --
18  A. Which statement are we talking about?
19 This one in the --
20  Q. The second. That Deputy Alvarado
21 advised he did this in reference to the changes we
22 talked about, quote, "because he felt it had to be
23 done and it had nothing to do with the video that
24 surfaced."
25  My question is purely: Do you find that

**140**

1 statement from Deputy Alvarado to be credible?
2  A. Yes. Because that's what he told me. I
3 had nothing to support otherwise.
4  Q. And part of what he said that you found
5 credible was, quote, "he felt it had to be done"?
6  A. Correct.
7  Q. Let's continue in this report.
8  We go down to the very last sentence.
9 Let me show you where I'm reading. I'm reading
10 backwards.
11  A. Right here?
12  Q. I believe so.
13  It begins -- yes, sir. That's it.
14  I want to refer you to this last
15 sentence. It starts off "Deputy Alvarado" -- do
16 you see where I'm reading from?
17  A. Right.
18  Q. -- "was instructed by Sergeant Cañas
19 after speaking to Captain Guttuso not to write a
20 report after the fact because an investigation had
21 been initiated."
22  Did I read that correctly?
23  A. Correct.
24  Q. Here's my question: Did you instruct
25 Deputy Alvarado not to write a report?

**141**

1  A.  After my conversations with Internal
2 Affairs, yes.
3  Q.  So initially you told him to hold off
4 on --
5  A.  Yeah.  I said hold off.  Let me run it
6 up, you know, to the chief and then the IAD and
7 then once we all said, yeah, we're not going to do
8 a report on it, I'll just have the inter- --
9 document on the interoffice memorandum and we're
10 not going to do the report, I contacted, said no,
11 you're not -- we're not going to do a report,
12 just -- no.
13  Q.  And that's my question.
14      (Interruption by cell phone.)
15  MR. CARTER:  Give me two minutes.
16  MR. MARTINY:  Let me answer it.
17      (Discussion off record.)
18 BY MR. CARTER:
19  Q.  Captain, we were looking at the Internal
20 Affairs report.  We were looking at page 10.
21  A.  Correct.
22  Q.  And we were looking at the sentence that
23 begins, quote, "Deputy Alvarado was instructed by
24 Sergeant Cañas, after speaking to Captain Guttuso,
25 not to write a report after the fact because an

**142**

1 investigation had been initiated."
2      Did I read that correctly?
3  A.  Yes, you did.
4  Q.  After you talked to Deputy Alvarado at
5 the copy machine and you told him to hold off on
6 writing a report, did you later follow up with him
7 regarding a written report?
8  A.  Yes.
9  Q.  And when -- how did you follow up with
10 him?
11  A.  Probably -- I don't know if I had him
12 come in again or I probably might have just
13 called -- I probably just called him on the phone
14 and said, look, don't write -- I spoke to IAD, I
15 spoke to Chief Wingrove, don't write a report.
16  Q.  And you gave him the specific
17 instruction not to write a report?
18  A.  Correct.  Told him not to write a
19 report, yes.
20  Q.  Did anyone else give him a specific
21 instruction to not write a report?
22  A.  I don't know.
23  Q.  When I say "specific," did Sergeant
24 Cañas tell Deputy Alvarado not to write a report?
25  A.  I don't know what he told Deputy

**143**

1 Alvarado.  I wasn't part of that conversation.
2  Q.  The only one you're aware of is the one
3 that you had?
4  A.  Right.
5  Q.  And the same would be true with Chief
6 Wingrove or Major Boudreaux or anyone else
7 involved --
8  A.  Right.
9  Q.  -- that you could just speak for
10 yourself?
11  A.  Correct.
12  Q.  And you know for certain you instructed
13 him not to write a report?
14  A.  Correct.  After speaking with my chief
15 and I- -- Internal Affairs, yes.
16  Q.  And you told him that on September 21st?
17  A.  Yeah.
18  Q.  The day after the incident?
19  A.  Right.  Right.
20  Q.  You talked to him --
21  A.  -- later that day, right.
22  Q.  So you talked to him that morning when
23 he came in at the --
24  A.  Right.
25  Q.  And you talked to him at the copy

**144**

1 machine?
2  A.  Correct.
3  Q.  Later that day, you talked to him either
4 in person or over the phone and that's when you
5 instructed him not to write the report?
6  A.  Right, correct.
7  MR. CARTER:  Let me review my notes.
8  MR. MARTINY:  I had two questions for him.
9  MR. CARTER:  You want to go?
10      EXAMINATION
11 BY MR. MARTINY:
12  Q.  Just to make sure it's clear on the
13 record, when you told Deputy Alvarado not to do a
14 report, we're talking about do -- that would be an
15 offense report?
16  A.  Correct.  In ARMS.
17  Q.  One of those forms that you use for ARMS
18 that Mr. Carter asked you about?
19  A.  Correct.
20  Q.  Did you ever tell him not to do any type
21 of report or memorandum on the incident?
22  A.  No.  I told him to do it.
23  MR. CARTER:  Object to form.  You may answer
24 it.  Go ahead.
25  A.  I told him to do an interoffice

145

1 memorandum to document the incident.
2 BY MR. MARTINY:
3   Q.   Do you know of any evidence that would
4 suggest that anybody in the sheriff's office was
5 trying to cover up that incident?
6       MR. CARTER:  Objection to form.
7 BY MR. MARTINY:
8   Q.   You can answer.
9   A.   No.  Not to my knowledge, no.
10      MR. MARTINY:  That's all I've got.
11              RE-EXAMINATION
12 BY MR. CARTER:
13  Q.   The instruction you gave to Deputy
14 Alvarado to not write a report, what policy or
15 procedure is there that supports that position to
16 instruct Deputy Alvarado to not write a report?
17 Where can I look at to find that policy?
18  A.   To not write a report?
19  Q.   Yes, sir.
20  A.   There is no policy.
21  Q.   Is there -- it's not in the policy of
22 Internal Affairs?
23  A.   Correct.
24  Q.   It's not in the SOP policies anywhere?
25  A.   Not that I -- not to my knowledge, no.

146

1   Q.   Okay.
2       MR. CARTER:  I have no further questions.
3       MR. MARTINY:  All right.
4            (Discussion off record.)
5       COURT REPORTER:  Would you like a copy?
6       MR. MARTINY:  Yes.
7            (END OF TESTIMONY AT 12:52 P.M.)

147

1              REPORTER'S PAGE
2       I, DIXIE VAUGHAN, Certified Court
3 Reporter in and for the State of Louisiana, (CCR
4 #28009), as defined in Rule 28 of the Federal
5 Rules of Civil Procedure and/or Article 1434(B) of
6 the Louisiana Code of Civil Procedure, do hereby
7 state on the Record:
8       That due to the interaction in the
9 spontaneous discourse of this proceeding, dashes
10 (--) have been used to indicate pauses, changes in
11 thought, and/or talkovers; that same is the proper
12 method for a Court Reporter's transcription of
13 proceeding, and that the dashes (--) do not
14 indicate that words or phrases have been left out
15 of this transcript;
16      That any spelling of words and/or names
17 which could not be verified through reference
18 material have been denoted with the phrase
19 "(phonetic)";
20      That (sic) denotes when a witness stated
21 word(s) that appears odd or erroneous to show that
22 the word is quoted exactly as it stands.
23
24          DIXIE VAUGHAN, CCR
25

148

1         R E P O R T E R ' S   C E R T I F I C A T E
2       I, Dixie Vaughan, Certified Court
3 Reporter (Certificate #28009) in and for the State
4 of Louisiana, as the officer before whom this
5 testimony was taken, do hereby certify that on
6 Wednesday, December 13, 2023, in the
7 above-entitled and numbered cause, the DEPOSITION
8 of CAPTAIN FRANK GUTTUSO, after having been duly
9 sworn by me upon authority of R.S. 37:2554, did
10 testify as hereinbefore set forth in the foregoing
11 147 pages;
12
13      That this testimony was reported by me
14 in stenographic shorthand, was prepared and
15 transcribed by me or under my personal direction
16 and supervision, and is a true and correct
17 transcript to the best of my ability and
18 understanding;
19
20      That the transcript has been prepared in
21 compliance with transcript format guidelines
22 required by statute or by rules of the board;
23
24      That I have acted in compliance with the
25 prohibition on contractual relationships, as